RANDALL E. MCDONALD, APPELLEE, V. LINCOLN U-CART CONCRETE CO. ET AL., APPELLANTS.
442 N.W.2d 892

Filed July 21, 1989.   No. 88-924.

David A. Barron, of Cline, Williams, Wright, Johnson & Oldfather, for appellants.

Hal Bauer, of Bauer, Galter & O'Brien, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

The defendants-appellants bring this action from the decision of a three-judge panel of the Nebraska Workers' Compensation Court. The panel, in a 2-to-1 decision, affirmed the decision of the judge at the first hearing, who found the plaintiff-appellee, Randall E. McDonald, permanently totally disabled. We affirm.

In September 1979, the appellee suffered a head injury while in the scope of his employment at his father's business, Lincoln

U-Cart Concrete Co. He was paid temporary total disability benefits from September 1979 through October 1980 and was paid benefits based on a 30-percent permanent partial disability to the body as a whole from October 1980 to February 1984. The original award was modified, and, in February 1984, the appellee began receiving benefits for temporary total disability. The court ordered the payment of benefits "for so long as the plaintiff remains temporarily totally disabled as a result of the plaintiff's accident and injury of September 8, 1979." Subsequently, in October 1987, appellant The Hartford Insurance Company unilaterally terminated the appellee's benefits.

Pursuant to an application by the appellee, one judge of the Workers' Compensation Court found the appellee totally disabled and ordered the appellants to pay the appellee $84 per week as total permanent disability benefits. The court also awarded the appellee $750 for attorney fees and a 50-percent waiting time penalty for delinquent payments after October 1987. See Neb. Rev. Stat. § 48-125 (Reissue 1988).

The appellants requested a rehearing before the Workers' Compensation Court, en banc. On June 3, 1988, when the rehearing was held, the appellee was employed with Perkins Restaurant. A two-judge majority affirmed the one-judge decision and awarded an additional $1,000 for attorney fees.

In their appeal to this court, the appellants assign three errors. They contend that the three-judge panel erred by (1) not sustaining the appellants' objection to questions asked of appellee's medical expert that called for responses beyond the scope of the witness' expertise and that required the witness to render opinions based upon incorrect statements of applicable law; (2) holding the appellee is permanently totally disabled; and (3) holding there was no reasonable controversy, and thus awarding to the appellee a penalty and attorney fees at the first hearing and rehearing level.

The appellants' first assignment of error relates to an opinion rendered by the appellee's medical expert, Dr. Eli S. Chesen. During a deposition, Dr. Chesen was given the following definition of total disability by the appellee's attorney: "A worker who, because of his injury, is unable to

perform or obtain any substantial amount of labor, either in his particular line of work, or in any other for which he would be fitted except for the injury, is totally disabled."

Based on that definition, Dr. Chesen stated that it was his opinion that the appellee was totally disabled. The appellants contend that Dr. Chesen's opinion must be disregarded because it is based on an improper legal definition of total disability. Specifically, they claim the definition proffered by the appellee is incorrect because an inquiry into the type of work "for which [the plaintiff] would be fitted except for the injury" is an element not contained in this court's current analysis of total disability.

We begin our analysis by noting that the definition of total disability offered by the appellee is verbatim the definition stated by this court in *Minshall v. Plains Mfg. Co.*, 215 Neb. 881, 341 N.W.2d 906 (1983), and its progenitors. See, also, *Parker v. St. Elizabeth Comm. Health Ctr.*, 226 Neb. 526, 412 N.W.2d 469 (1987). However, according to the appellants, this court's current and different definition of total disability is set forth in *Kleiva v. Paradise Landscapes*, 230 Neb. 234, 430 N.W.2d 550 (1988). In *Kleiva* we said that "[t]otal disability means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he was trained for, or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do." (Emphasis omitted.) *Id.* at 235, 430 N.W.2d at 552. The appellants' interpretation of *Kleiva* is not entirely correct. Since *Elliott v. Gooch Feed Mill Company*, 147 Neb. 309, 23 N.W.2d 262 (1946), this court has employed both definitions in defining total disability. See, e.g., *Craig v. American Community Stores Corp.*, 205 Neb. 286, 287 N.W.2d 426 (1980); *Camp v. Blount Bros. Corp.*, 195 Neb. 459, 238 N.W.2d 634 (1976); *Nordahl v. Erickson*, 174 Neb. 204, 116 N.W.2d 275 (1962); *Rapp v. Hale*, 170 Neb. 620, 103 N.W.2d 851 (1960), *overruled on other grounds, Gifford v. Ag Lime, Sand & Gravel Co.*, 187 Neb. 57, 187 N.W.2d 285 (1971); *Tilghman v. Mills*, 169 Neb. 665, 100 N.W.2d 739 (1960); *Crable v. Great Western Sugar Co.*, 166 Neb. 795, 90 N.W.2d 805 (1958); *Haler v. Gering Bean Co.*, 163 Neb. 748, 81 N.W.2d 152 (1957); *Dietz v. State*, 157 Neb. 324,

59 N.W.2d 587 (1953); *Franzen v. Blakley*, 155 Neb. 621, 52 N.W.2d 833 (1952); *Elliott v. Gooch Feed Mill Co.*, 147 Neb. 612, 24 N.W.2d 561 (1946). As *Minshall v. Plains Mfg. Co., supra*, and *Kleiva v. Paradise Landscapes, supra*, demonstrate, this court has on occasion used one or the other definition instead of applying them both to define total disability. That fact notwithstanding, they are both correct and current definitions of total disability as used by this court. Despite the appellants' assertions to the contrary, the two definitions legally mean exactly the same thing.

The appellants also argue that Dr. Chesen's opinion should have been excluded because there was no foundational showing that his expertise extended to employability. Under Neb. Rev. Stat. § 48-168 (Reissue 1988), the Nebraska Workers' Compensation Court has broad discretion to admit or exclude expert testimony to ascertain the substantial rights of the parties and to carry out justly the spirit of the Nebraska Workers' Compensation Act. See, also, *Sanchez v. Derby*, 230 Neb. 782, 433 N.W.2d 523 (1989) (in a civil case the admission or exclusion of expert testimony is largely within the broad discretion of the trial court). Our examination of the record does not indicate any abuse of discretion on the part of the court. Accordingly, Dr. Chesen's opinion, based on a correct definition of total disability, was properly admitted into evidence. The appellants' first assignment of error is without merit.

The appellants next assignment of error is that the three-judge panel erred in holding that the appellee was permanently totally disabled. Our scope of review is controlled by Neb. Rev. Stat. § 48-185 (Reissue 1988), which provides in part:

> The findings of fact made by the compensation court after rehearing shall have the same force and effect as a jury verdict in a civil case. A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers, (2) the judgment, order, or award was procured by fraud, (3) there is not sufficient competent evidence in the record to

warrant the making of the order, judgment, or award, or (4) the findings of fact by the compensation court do not support the order or award.

See *Elliott v. Midlands Animal Products*, 229 Neb. 823, 428 N.W.2d 920 (1988).

In reviewing workers' compensation cases, the Supreme Court is not free to weigh the facts anew. The Supreme Court's standard of review accords to the findings of the compensation court the same force and effect as a jury verdict in a civil case, and such findings will not be set aside unless clearly wrong.

An order of the compensation court may be reversed or set aside with respect to the evidence only where there is not sufficient evidence in the record to warrant the order or judgment. In testing the sufficiency of the evidence to support the findings, every controverted fact must be resolved in favor of the successful party, and he should have the benefit of every inference that can be drawn therefrom. Such findings on rehearing will not be set aside on appeal unless clearly wrong. *Kingslan v. Jensen Tire Co.*, 227 Neb. 294, 417 N.W.2d 164 (1987).

The record shows that McDonald was 18 years old at the time of the accident. He completed his senior year of high school, but lacked enough credits to graduate, though he was registered to go back to school to earn those credits. Prior to the accident, McDonald was a normal teenage boy who got along well with everyone, liked to roller skate, and was a member of the Boy Scouts. He worked for his father in several family businesses. In one of the businesses, Adco Signs Inc., McDonald performed electrical wiring; drove trucks; did metalwork; assembled, painted, and installed signs; and ran a crane. At Lincoln U-Cart Concrete, another family business, he mixed concrete, took orders, sold cement, collected money, drove trucks, and periodically ran the business.

In September 1979, in an attempt to secure help to repair a cement mixer, McDonald, while riding on his motorcycle, was injured in a collision with an automobile. He suffered a severe head injury, which manifested in a complete change in his personality. According to McDonald's father, his son "doesn't act normal." McDonald makes improper remarks, makes

funny faces, and "doesn't make sense some times." He tires easily, is not as alert as he once was, talks to himself, and is emotionally unstable. His IQ is 79, which is in the range between normality and mental retardation. McDonald also suffers from problems in his level of intellectual functioning. He has difficulty in processing the answers to simple questions; in expressing himself in a clear, concise fashion; and with his memory. In addition, McDonald suffers from seizures and epilepsy. In 1984, McDonald underwent a craniotomy to remove damaged and scarred portions of his brain. After the surgery, the seizures stopped for a period of time, only to resume again. Currently, McDonald is taking Dilantin and phenobarbital, anticonvulsant medications, to control his epilepsy. Dr. Chesen examined McDonald prior to the surgery in February 1984, and in December 1987. During Dr. Chesen's deposition he was asked what he observed during the later examination:

A. . . . I observed a person who demonstrated similar problems to that seen on the first examination, although there was a *very slight improvement* in his condition in 1987 as compared to 1984.

Q. Was there much change in his condition, did you say?

A. There was a slight change.

Q. And will you describe what that was?

A. Yes. I felt that in comparing the examinations, which were done three years apart, that his mentation or thinking ability was slightly better. He was thinking a little more quickly, able to put sentences together with slightly greater facility. It didn't seem to be quite as much of a pause between my having asked him a question and his having attempted to answer those questions.

(Emphasis supplied.)

McDonald's work history is sporadic at best. After the injury, he did not work for more than a year. McDonald's father attempted to bring his son back into one of the family businesses. He worked for a short period at his father's liquor store, but did not perform well, since he could not get along with fellow employees, got into "problems with customers,"

and was "confused on selling." McDonald's father then placed him in the sign and concrete businesses. McDonald could not cope with the tasks incident to those jobs. He was unable to drive a truck because of his seizures. He experienced seizures on the job; he never finished any jobs assigned to him; he lacked the stamina to work; and the work he did do was of poor quality. McDonald was terminated after 1 month.

Sometime after being terminated, but before his surgery in 1984, McDonald worked for 9 months as a fry cook for the University of Nebraska. The circumstances of how he left the job at the university are not in the record. Further, the record is unclear regarding McDonald's employment status after this period until 1988, when he began working for Perkins Restaurant. Apparently, McDonald remained unemployed during this period, though he did participate in a rehabilitation program.

Just prior to the surgery in 1984, the rehabilitation services division of the Nebraska Department of Education began working with McDonald. From March to August of 1987, he participated in the food services training program operated in the State Capitol cafeteria. He was trained in cashiering and beverage and counter work. Sue Amiottee, an adjustment counselor with the rehabilitation services division, was McDonald's counselor. She testified that McDonald is a slow learner, slow at doing tasks, and has problems with his short-term memory. During the training program, when McDonald was switched from one job to another, he displayed regression and lack of emotional tolerance. McDonald also demonstrated forgetfulness and suffered from lapses in concentration. In addition, he did not handle stress very well. He swore under his breath and made other comments, exhibited inappropriate behavior when working with the public, and made faces. McDonald became very defensive and emotionally upset whenever he thought his abilities were being questioned. Finally, Amiottee testified that McDonald has a low emotional tolerance to noise. On at least one occasion, McDonald was observed shaking his fist, threatening to walk out of the job, and making threats under his breath about what he was going to do to other people. Though he successfully graduated from the

training program, Amiottee felt that he needed direct placement so that he could receive special assistance in finding a job and receive further training. It was her opinion that McDonald should work as a cashier at a place where he would not be required to work very fast. Progress reports showed that McDonald did improve his skills and, to a degree, alleviated some of his behavioral problems. Yet despite these improvements, Amiottee thought McDonald needed a job where the employer could provide close supervision. According to her, one reason McDonald was working at Perkins Restaurant was because the employer was willing to provide the extra supervision McDonald needs.

The appellants countered with their own expert, a rehabilitation counselor, who rendered the opinion that McDonald could obtain and hold significant, gainful employment. However, on cross-examination, the appellants' expert did admit that at one time she wrote a letter to an attorney representing the appellants stating that the appellee should not deal directly with the public. Finally, when questioned directly by the three-judge panel, this expert admitted that her opinion was based on McDonald's ability to care for himself in an independent living situation and that it is uncertain whether he can care for himself.

The record shows that when McDonald graduated from the training program the appellant The Hartford Insurance Company terminated his benefits on the basis that he was now able to resume working in the food services area, though McDonald did not have a job at that time. The appellee remained unemployed until some time prior to June 1988, when rehabilitation services managed to obtain a job for him at Perkins Restaurant. Rehabilitation services assisted in filling out McDonald's job application and provided special on-the-job training for 2 weeks, consisting of extra supervision. At best, the job at Perkins Restaurant can only be described as part-time work. The appellee works only 16 to 18 hours a week busing tables, scraping gum from underneath tables, and cleaning bathrooms.

It is abundantly clear that the accident has significantly reduced the appellee's intelligence and capacity. As previously

noted, there was expert opinion evidence that the appellee was totally disabled. Dr. Chesen also testified that the disability was a direct result of appellee's traumatic encephalopathy, which is an abnormality of the brain as a result of physical trauma, and that McDonald's condition is permanent because brain tissue does not regenerate. Based on the foregoing, there is sufficient evidence to demonstrate that McDonald is permanently totally disabled. The record also illustrates the appellee's need for a special environment to work in. It is evident that by any objective standard the appellee can only work at the sufferance of an employer willing to provide the extra supervision and who would tolerate his aberrational behavior. We also find persuasive the comment by the rehearing panel in its opinion that "[w]hile it may not come through in the printed word the Court, upon observation of the plaintiff, can fairly describe the plaintiff's handicap as obvious and profound." As this court said in *Craig v. American Community Stores Corp.*, 205 Neb. 286, 287 N.W.2d 426 (1980),

> " '[A]n employee may be totally disabled for all practical purposes and yet be able to obtain *trivial* occasional employment under rare conditions at small remuneration. The claimant's status in such respect remains unaffected thereby unless the claimant is able to get, hold, or do any substantial amount of remunerative work either in his previous occupation or any other established field of employment for which he is fitted.' "

(Emphasis supplied.) *Id*. at 291, 287 N.W.2d at 429. While noting that not all part-time work such as the appellee's is trivial, under the circumstances of this case, we fail to see how appellee's work can be considered anything but trivial. Accordingly, we hold that there are sufficient facts to support the rehearing panel's determination that the appellee was permanently totally disabled.

The last error relates to the appellants' contention that the rehearing panel erred by holding there was no reasonable controversy, and thus awarding to the appellee a penalty and attorney fees at the first hearing and at the rehearing level. Attorney fees are authorized under Neb. Rev. Stat. § 48-125 (Reissue 1988) where there is no reasonable controversy

regarding an employee's claim for workers' compensation. *Rodriquez v. Prime Meat Processors*, 228 Neb. 55, 421 N.W.2d 32 (1988). "Whether a reasonable controversy exists is a question of fact, and this court is bound by the findings of the compensation court on rehearing, to the extent such findings have support in the evidence." *Rodriquez v. Prime Meat Processors, supra* at 67, 421 N.W.2d at 40. The evidence clearly supports the award and penalty imposed by the panel. Without belaboring the point, it is fairly obvious that the appellee is permanently totally disabled and that he has been since at least the 1984 surgery. Other than giving temporary relief from his recurrent seizures, the surgery failed to improve the appellee's condition. Under these facts, the appellants were totally unjustified in unilaterally terminating the appellee's benefits.

Accordingly, the decision of the three-judge panel of the Nebraska Workers' Compensation Court is affirmed. Appellee's counsel is awarded a fee of $1,500 for services in this court.

AFFIRMED.