DAVID J. SHERWOOD, APPELLEE, V. GOOCH MILLING AND
ELEVATOR CO., A DIVISION OF ADM MILLING CO., A MINNESOTA
CORPORATION, ET AL., APPELLANTS.

453 N.W.2d 461

Filed April 6, 1990.   No. 89-681.

Scott A. Burcham, of Baylor, Evnen, Curtiss, Grimit, & Witt, for appellants.

Mark D. Petersen, of Healey, Wieland, Kluender, Atwood, Jacobs & Geier, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

The defendant-appellant employer, Gooch Milling and Elevator Co., a division of ADM Milling Co., and its insurance carrier, defendant-appellant Old Republic Insurance Company, challenge the award of workers' compensation benefits to the employee, plaintiff-appellee David J. Sherwood. Defendants assign as error the Workers' Compensation Court's (1) finding that Sherwood suffers from an occupational disease arising out of and in the course of his employment, (2) finding that Sherwood is temporarily totally disabled, (3) awarding Sherwood vocational rehabilitation services, and (4) awarding Sherwood certain fees and assessing certain costs against the defendants. We affirm as modified.

Sherwood began his employment with Gooch Milling on February 12, 1968, performing various tasks of physical labor. Gooch Milling's brief states that Sherwood "has a substantial history of respiratory problems dating back to the early 1970's . . . ." Brief for appellants at 7. This assertion is apparently based upon an excerpt from a report by the National Jewish Center for Immunology and Respiratory Medicine, which states:

> Mr. Sherwood was hospitalized for one week in the early 1970s, for respiratory symptoms, after the feed mill [apparently the same Gooch feed mill as the one in which he worked prior to becoming disabled] was fumigated and he was cleaning out dust. The fumigation was "phos toxin" which were pellets that led to a gas. He felt that the gas exposure, probably phosgene, was responsible for his respiratory symptoms, although he recalls that a doctor felt that perhaps he was allergic to mildew in the dust.

However, this earlier hospitalization seems to be only an isolated incident in that the record indicates that Sherwood was

generally very healthy from 1968 through 1985.

Beginning in 1982, after working at various other positions at Gooch Milling, Sherwood began working as a fat coater in Gooch Milling's dogfood processing facility. As a fat coater, Sherwood operated and monitored machinery which sprayed tallow and a product named "BioDigest" onto the dogfood being processed. The air in the area where Sherwood worked as a fat coater was hot and humid and apparently contained suspended vapors from the heated liquids which were sprayed onto the dogfood.

The record indicates that when Gooch Milling began spraying BioDigest onto dogfood sometime between 1983 and 1985, the BioDigest had a strong acidic odor which irritated the throats and lungs of Gooch Milling's employees.

After Gooch Milling began using BioDigest, Sherwood began experiencing respiratory problems, including shortness of breath and coughing which frequently became so severe that it induced vomiting. On July 29, 1986, Sherwood was hospitalized as a result of severe coughing and vomiting which seemed to be induced by his on-the-job exposure to BioDigest. Sherwood was released to return to work on August 11, 1986.

Sherwood's physician, Dr. Anup K. Chakraborty, again restricted Sherwood from his occupational duties, for a 12-week period beginning in March 1987, and recommended that he not be exposed to BioDigest fumes when he returned to work in June 1987. Sherwood's duties were changed after he returned to work in June 1987, and at that time he became an "extruder operator" at Gooch Milling, a position which he had held prior to working as a fat coater. His health remained in an improved state until he was again exposed to BioDigest fumes later in August or September 1987, when Sherwood once more experienced headaches, coughing, vomiting, and shortness of breath in association with his exposure to the fumes.

On October 26, 1987, Chakraborty advised Sherwood to totally avoid exposure to BioDigest fumes. Contrary to his doctor's advice, and at the urging of his superiors at Gooch Milling, Sherwood did return to work on October 26. He also worked the next day, October 27, and on that date suffered headaches and coughing spells which resulted in vomiting.

Sherwood testified that he had told his superiors at Gooch Milling that his doctor had advised him not to work on October 26. But since his superiors nevertheless told him to go to work, Sherwood did work from October 26 through October 28, because he feared the prospect of losing his employment with Gooch Milling in the event he refused to work on those dates. On October 28, before his shift had ended, Sherwood, along with his fellow employees, was escorted off the Gooch Milling premises because of an impending labor strike.

Gooch Milling paid Sherwood temporary total disability benefits in connection with his absences from work prior to October 28, 1987 (e.g., in July 1986 and from March 11, 1987, through June 7, 1987); however, Gooch Milling paid no such benefits to Sherwood after October 28, and he has not worked since that date. The labor strike which began on October 28, 1987, ended on or about January 26, 1988.

Sherwood made inquiries regarding his temporary total disability benefits and was told by Gooch Milling representative Harold Kennedy that he could not receive such benefits because he was on strike. He was also told that he could not return to work without a medical release.

In a continuing effort to alleviate Sherwood's symptoms, Chakraborty referred Sherwood to the National Jewish Center for Immunology and Respiratory Medicine in Denver, Colorado. The report by Dr. Kathleen Kreiss, director of the occupational medicine program at the center, refers to clinic visits on August 30 and 31, 1988, and September 1, 1988, and states in part:

> We have seen many patients, who after noxious exposures in their work situations develop persistent respiratory complaints, including "supersensitivity" to many irritants and odors. When we do not find an organic basis for such complaints, we usually think of these symptoms as representing post traumatic stress disorder. Mr. Sherwood clearly has a physical reason for his cough, in that he wakes frequently at night from coughing. This nocturnal cough is not compatible with a psychogenic origin to his cough. Nevertheless, his impairment seems to be out of proportion to any objective tests of airways or

parenchymal function. Mr. Sherwood acknowledges that he often does not vomit when it is socially unacceptable and that he feels that his coughing, headaches, and vomiting are worse in situations when he is stressed. Thus, although he has some physical reason for his cough, I think that his symptoms have been magnified, probably as a result of a post traumatic stress disorder.

There are at least two possible reasons for his persistent coughing. He describes sputum production, and often feels that his coughing is relieved for an hour or so when he is able to bring up phlegm. He describes this phlegm as extremely sticky and difficult to bring up. This is compatible with chronic bronchitis caused by occupational exposure to acid irritants. In addition, he describes stuffy nose, which is probably accompanied by postnasal drip, another common cause of cough. It is clear that Mr. Sherwood has an extremely reactive posterior pharynx. This may be due to the inflammation that he sustained in the two years that he worked with Biodigest. In any case, he seems to be unable to tolerate stimulation of his pharynx by postnasal drip, which might be un-perceived by other people. . . .

. . . .

. . . In conclusion, Mr. Sherwood's symptom of chronic cough is most compatible with chronic bronchitis, with a possible contribution of postnasal drip. These symptoms arose in temporal relation to his exposure to an extreme irritant, which even the Material Safety Data Sheet, says should be used with adequate ventilation and respiratory protection. There is no other plausible explanation for the etiology of his chronic cough. However, his cough is probably exacerbated by anxiety over the meaning of his symptoms and their progression to severe headache and vomiting on a frequent basis. His extreme reaction to many irritants may partly represent a post traumatic stress disorder, again a work-related condition, related to his exposure to spills that precipitated many medical consultations.

At Gooch Milling's request, Sherwood was seen by Dr.

Richard Osterholm of Omaha, Nebraska. A December 12, 1988, letter sent to Gooch Milling's attorney by Osterholm and his colleagues, Drs. Frank LaMarte and Marlin Stahl, details numerous tests which Sherwood had undergone, and in part states the following:

> Our impression is one of bronchitis which is associated with cough. The laboratory and clinical parameters identified support no impairment of functional respiratory capacity.
>
> Except for a bronchial biopsy finding consistent with minimal chronic non-specific bronchitis and a slightly depressed PO2 of 67, this individual's entire current work-up is normal. . . .
>
> . . . .
>
> . . . Mr. Sherwood is a lifelong non-smoker who reports being in normal health prior to his reported work-related exposure to BioDigest. According to the patient's history there appears to be a temporal relationship between the time of exposure and the onset of his symptoms. . . . We would agree . . . that the information currently available does not allow for a definitive diagnosis for a "work-related event". The exposure described was temporally associated with development of bronchitis. However, at this time there is little evidence if any of impairment of functional respiratory capacity. . . . It is concievable [sic] that his cough which is reportedly exaggerated by inhaling irritants could affect his work performance in a variety of different jobs. However, we do feel he is employable. We recommend he avoid exposure to BioDigest.

Sherwood had been seen earlier by Dr. Stephen Rennard of the University of Nebraska Medical Center in Omaha. A May 1, 1987, letter from Rennard to Sherwood's attorney states in part:

> [W]hile the information currently available does not allow a definitive diagnosis for a "work related" event, as noted above, the history is certainly suggestive. We have recommended that Mr. Sherwood continue to restrict his exposure to "Bio-Digest". This final recommendation is

made empirically and seems "common sense" but is not based on a definitive diagnosis of a work related event.

I would repeat that while I'm unfamiliar with the specific product Bio-Digest this product is a mixture of enzymes. Enzymes are organic compounds and allergic reactions to this type of substance have been well reported in the literature.

Although Sherwood is a lifelong nonsmoker and apparently has not been exposed to BioDigest fumes since October 28, 1987, the testimony of his wife, Stephanie Sherwood, indicates that Sherwood's symptoms persist as of the date of the rehearing, December 5, 1988. Sherwood testified that he was physically unable to do the tasks required of him at his previous jobs.

In addition to the foregoing, a December 16, 1988, letter from Chakraborty to Sherwood's attorney states in part:

In short, we have a gentleman who is now 45 years of age, has never smoked in his life and since being exposed to the extremely irritant, toxic fumes since 1985 has had a cough, dyspnea, headache and has come to a stage where he has severe coughing spells with minimal exertion or even with no exertion, such as at nighttime, which leads to vomiting. The only objective findings that we have is that the patient goes into coughing paroxysms with any attempted deep breathing, but has otherwise normal lung functions, bronchoscopic examinations, etc. All the physicians involved in his care agree that this patient is not faking his symptoms. Various medications have been tried on him and he has possibly had some improvement with the medications so far. The physician's group in Omaha did not think that a definitive diagnosis for a "work-related event" could be made, but they come out also with the recommendation that this patient should not go back to his previous work environment where he is exposed to these toxic fumes.

I had the opportunity to see Mr. Sherwood over the last 2¹/₂ years on various occasions in the office and remain quite convinced that his symptoms are genuine. I remain quite concerned about his symptoms and his suffering and

I am frustrated to see that the medications only offer very minimal relief of his symptoms. Without any history of previous smoking, without any other apparent predisposing factors such as immunoglobulin deficiency, bronchial asthma, cystic fibrosis, bronchiectasis, etc., I do not have any way of thinking of any other cause for his chronic, severe bronchitis but the occupational exposure to those irritant fumes. I realize that this patient had a house plastering job at a young age and also has been a woodcutter, involved in farming, cattle raising, hog breeding and has also been a volunteer rural firefighter, but I cannot imagine any of those could have led him to the present disability but for the exposure to the toxic fumes. . . .

. . . .

In conclusion, I can put it with reasonable medical certainty that there was a direct causation of this extremely irritant toxic fume exposure to this patient's bronchitis, that the patient is still having continued symptoms, that it is not possible to predict when he is going to recover, either partially or completely and that he should under no circumstances be exposed to the same environment again. He should remain under continued medical supervision and followup and undergo investigation as necessary.

The compensation court found that while Sherwood was employed at Gooch Milling, he "contracted industrial, bronchial asthma, an occupational disease, as a result of repeated exposure to toxic chemical fumes in the course and scope of his employment." The court further found that Sherwood, as a result of such exposure, remained temporarily totally disabled on December 5, 1988, and that he would remain so for an indefinite future period of time. The court therefore ordered the defendants to pay temporary total disability benefits to Sherwood as long as he remained so disabled and left the issue of a possible residual disability to be determined after Sherwood reaches maximum medical improvement. In addition, the court ordered the defendants to pay for reasonably necessary medical and hospital care resulting from

Sherwood's job-induced injury.

The compensation court also held that Sherwood was entitled to an evaluation for rehabilitation services, as provided in Neb. Rev. Stat. § 48-162.01 (Reissue 1988). The compensation court stated:

> There is a reasonable probability that with appropriate training, rehabilitation or education, the plaintiff may be rehabilitated to the extent that he can significantly increase his earning capacity; if the plaintiff desires to be evaluated as to his suitability for rehabilitation services, including job placement, he should contact the Rehabilitation Specialist of the Nebraska Workers' Compensation Court . . . within 30 days after the date of this Award; a report of any such evaluation shall be filed promptly with this Court, and copies thereof promptly furnished to all parties hereto, whereupon the Court, after affording the parties an opportunity to be heard, may take such action as is further provided in Section 48-162.01 . . . .

Defendants first contend that the compensation court erred in finding Sherwood's current condition to be causally related to his employment. In making this claim, defendants assert that Sherwood's condition is not "characteristic and peculiar" to his employment. It is true that unless the character of an injury is plainly apparent, an injury is a subjective condition, and an expert opinion is required to establish the causal relationship between an incident and the injury as well as any claimed disability consequent to such injury. *McMichael v. Lancaster Cty. Sch. Dist. 001*, 233 Neb. 603, 447 N.W.2d 35 (1989); *Fees v. Rivett Lumber Co.*, 228 Neb. 617, 423 N.W.2d 483 (1988); *Rodgers v. Sparks*, 228 Neb. 191, 421 N.W.2d 785 (1988). However, " '[d]etermination of causation is, ordinarily, a matter for the trier of fact.' " *Fees, supra* at 621, 423 N.W.2d at 486, quoting *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987). See, also, *Mutual of Omaha v. Broussard*, 233 Neb. 916, 448 N.W.2d 600 (1989).

In the present case, other than the temporal relationship between Sherwood's exposure to BioDigest and his respiratory affliction, there is no tangible, objective evidence linking

Sherwood's condition to his employment at Gooch Milling. However, Sherwood did undergo extensive testing to determine the cause of his condition. After such testing, Chakraborty concluded that Sherwood's condition was caused by his exposure to irritant fumes while working at Gooch Milling. Thus, Sherwood did present evidence that in the opinion of at least two treating physicians, his condition was caused by his employment.

The findings of fact made by the Workers' Compensation Court have the same force and effect as a verdict in a civil case and will not be set aside unless clearly wrong. *Carter v. Weyerhaeuser Co.,* 234 Neb. 558, 452 N.W.2d 32 (1990); *Mutual of Omaha v. Broussard, supra; Spangler v. State,* 233 Neb. 790, 448 N.W.2d 145 (1989).

In testing the sufficiency of the evidence to support the findings of fact made by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party. *Carter v. Weyerhaeuser Co., supra; Mutual of Omaha v. Broussard, supra; Spangler v. State, supra.*

Under the provisions of Neb. Rev. Stat. § 48-185 (Reissue 1988), findings of fact by the Workers' Compensation Court have the effect of a verdict in a civil case, and its judgment may not be set aside on appeal where there is evidence sufficient to support it. *Carter v. Weyerhaeuser Co., supra; Mutual of Omaha v. Broussard, supra.*

In view of the evidence presented by Sherwood, it cannot be said the compensation court was clearly wrong in determining that Sherwood's respiratory affliction was caused by his employment at Gooch Milling.

Defendants' second assignment of error claims that the compensation court erred in finding that Sherwood remained temporarily totally disabled on December 5, 1988. Total disability in the context of the workers' compensation law does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, for which the employee was trained or accustomed to perform, or any other kind of work which a person of the employee's mentality and attainments

could do. *Krijan v. Mainelli Constr. Co.*, 216 Neb. 186, 342 N.W.2d 662 (1984). See, also, *Kleiva v. Paradise Landscapes*, 230 Neb. 234, 430 N.W.2d 550 (1988); *McDonald v. Lincoln U-Cart Concrete Co.*, 232 Neb. 960, 442 N.W.2d 892 (1989).

Whether a worker is totally disabled is a question for the finder of fact. See *Kleiva, supra.*

Sherwood has a ninth-grade education and has very limited vocational training. His job experience prior to his work at Gooch Milling consists basically of physical labor and selling brushes. Sherwood's work at Gooch Milling has also required substantial physical labor.

Sherwood testified that he was physically unable to do the tasks required of him at his previous jobs, and the testimony of his wife confirms that Sherwood's symptoms persist. Chakraborty expressed the views that Sherwood was not "disabled for work, but he has serious problems when exposed to the toxic fumes at the plant," and that he would be unable to and should not be "advised to return to his pre-injury work responsibilities as an extruder operator." A fair summary of those opinions is that although Sherwood is not disqualified from all employment, he cannot now do what he was last doing. That opinion, coupled with Sherwood's testimony that he is physically unable to perform the tasks required of him by his previous jobs and his wife's testimony that his symptoms continue, supports the compensation court's factual finding that Sherwood is presently temporarily totally disabled. See, *Kleiva v. Paradise Landscapes, supra*; *Kalhorn v. City of Bellevue*, 227 Neb. 880, 420 N.W.2d 713 (1988); *Smith v. Hastings Irr. Pipe Co.*, 222 Neb. 663, 386 N.W.2d 9 (1986).

Defendants' third assignment of error asserts the compensation court erred in finding that Sherwood was entitled to vocational rehabilitation services as awarded on rehearing.

While defendants claim the compensation court awarded Sherwood rehabilitation services, the court, although not as clearly as it might have, ordered only that an evaluation be conducted if desired by Sherwood. In any event, an injured worker's right to vocational rehabilitation services depends upon his inability to perform work for which the worker has

previous training and experience. *Hernandez v. Farmland Foods*, 227 Neb. 629, 418 N.W.2d 765 (1988); *Smith v. Hastings Irr. Pipe Co., supra*. Whether an injured worker is entitled to vocational rehabilitation is ordinarily a question of fact to be determined by the compensation court. *Hernandez v. Farmland Foods, supra*; *Smith v. Hastings Irr. Pipe Co., supra*.

As shown by the analysis of defendants' second assignment of error, the evidence is sufficient to uphold the compensation court's determination that Sherwood is not able to perform work for which he has previous training and experience.

Section 48-162.01(6) allows the compensation court to award rehabilitation services when a total or partial disability is or is likely to be permanent if there is a reasonable probability that such services will enable a disabled worker to become gainfully employed or increase his or her earning capacity. The compensation court could conclude from Chakraborty's December 16, 1988, letter to Sherwood's attorney that Sherwood's condition was likely to be permanent. Consequently, the compensation court's finding that Sherwood is disabled being supported in the evidence, that court cannot be said to have been clearly wrong in allowing Sherwood to be evaluated in order to determine his suitability for rehabilitation services.

Defendants' fourth assignment of error alleges that certain expert witness fees and transcript costs should not have been assessed against them.

With respect to expert witness fees, Neb. Rev. Stat. § 48-172 (Reissue 1988) is applicable. That section states in applicable part:

> When a reasonable attorney's fee is allowed the employee against the employer as provided in section 48-125, the compensation court shall further assess against the employer as costs of the employee . . . the fees and mileage for necessary witnesses attending the proceedings at the instance of the employee. Both the necessity for the witness and the reasonableness of the fees shall be approved by the compensation court.

On rehearing, the award of the compensation court included $400 for an expert witness fee. The record indicates that the fee

was incurred to Wedgewood Medical Center, the medical group with which Chakraborty is associated, in connection with a billing dated April 12, 1988. However, the record in this case does not include any expert testimony relating to the $400 billing which is dated April 12, 1988, so apparently this testimony was only used, if at all, in the initial hearing on June 2, 1988. At that hearing, the compensation court ruled that a reasonable controversy existed and did not award attorney fees. Therefore, § 48-172 does not authorize the compensation court's awarding of the witness fee in question.

Regarding the alleged error with respect to the awarding of transcript costs, Neb. Rev. Stat. § 48-182 (Reissue 1988) is applicable. That section states in part:

> In case either party at interest refuses to accept any final order of the Nebraska Workers' Compensation Court after rehearing, such party may, within thirty days thereafter, file with the compensation court a notice of intention to appeal and within thirty days from the date of such final order file with the compensation court a praecipe for a bill of exceptions. Within two months from the date of the filing of the praecipe, the court reporter or transcriber shall deliver to the clerk of the Nebraska Workers' Compensation Court a bill of exceptions which shall include a transcribed copy of the testimony and the evidence taken before the compensation court, which transcript when certified to by the person who made or transcribed the record shall constitute the bill of exceptions. *The transcript and bill of exceptions shall be paid for by the party ordering the same . . . .*

(Emphasis supplied.)

The compensation court thus acted correctly in requiring defendants to pay the charges associated with the rehearing transcript.

For the foregoing reasons, the judgment of the compensation court is affirmed as modified.

AFFIRMED AS MODIFIED.