DONALD UZENDOSKI, APPELLANT AND CROSS-APPELLEE, V.
CITY OF FULLERTON, NEBRASKA, A MUNICIPAL CORPORATION,
APPELLEE AND CROSS-APPELLANT.

131 N. W. 2d 193

Filed November 6, 1964. No. 35873.

Philip T. Morgan, for appellant.

Walter P. Lauritsen, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER,
SPENCER, and BOSLAUGH, JJ., and DIERKS, District Judge.

CARTER, J.

The plaintiff, Donald Uzendoski, brought this action against the city of Fullerton to recover benefits alleged to be due under the Nebraska Workmen's Compensation Act. The district court for Nance County affirmed an award of the compensation court granting the plaintiff the sum of $30.77 per week from July 9, 1962, for 32-4/7 weeks as temporary total disability, and thereafter $30.77 per week for 21½ weeks for 10 percent permanent partial disability to plaintiff's left leg. Certain enumerated medical and hospital expenses were ordered paid about which there is no dispute if liability exists. The plaintiff has appealed. The defendant has cross-appealed, asserting that the injury to the plaintiff did not arise out of and in the course of his employment and that the trial court was in error in not so holding.

The evidence shows that on July 7, 1962, the date of the accident, plaintiff was employed by the city as a lifeguard at the city's municipal swimming pool. Plaintiff was compensated at the rate of $200 per month. The duties of the position were to protect swimmers against injury, to keep the pool clean, and to perform such other minor duties as were incidental to the operation of the swimming pool. Plaintiff's assigned hours were from 1 p.m. to 5 p.m. and 6:30 p.m. to 9 p.m., 7 days a week. The record shows that two lifeguards were employed and that each was permitted to be absent from work on alternate nights. There is evidence in the record that the lifeguards were permitted to swim in the pool when the occupancy of the pool was light, usually after 4 o'clock in the afternoon. The manager of the pool testified that this was the usual practice permitted and followed. There is also evidence that plaintiff was expected to give swimming, diving, and lifesaving lessons to swimmers in the forenoon without additional pay and without charge to the pupil.

On July 7, 1962, plaintiff came to work about 1 o'clock and, there being only a few persons in the pool, he

engaged in practicing diving from the high springboard which was 10 feet above the water. Twenty or thirty minutes later, in making a Gainer dive, he went into the water feet first and struck the bottom of the pool with the bottoms of his feet. The sensation was as if he had sprained his ankles. He continued work that day and the next, and on the day following was advised by the manager to see a doctor, which he did.

It is the contention of defendant, raised on cross-appeal, that the accident did not arise out of and in the course of the employment. The terms "arising out of" and "in the course of the employment" are used conjunctively and both conditions must be established. In the instant case the plaintiff was on the premises within his assigned hours of work when the accident occurred. He was in the course of his employment. The issue is whether or not the accident arose out of the employment. The words "arising out of" the employment refer to the origin or cause of the accident and are descriptive of its character. Appleby v. Great Western Sugar Co., Inc., 176 Neb. 102, 125 N. W. 2d 103.

It is argued by the defendant that plaintiff's assigned duties did not require him to be on the springboard and that he was not at the station where he was assigned, and was therefore outside the employment. On the other hand he was on the premises where he was required to be. He was permitted to use the pool while on duty and was not violating any rule or instruction of the employer. He was not, however, performing the precise work of his employment at the time of the accident. The act of diving into the pool was reasonably incident to the employment in that it was a matter of personal convenience immediately connected with his work. The case is similar in principle to Appleby v. Great Western Sugar Co., Inc., *supra,* and is controlled by that case wherein it is said: "The term arising out of the employment in the Workmen's Compensation Act covers all risks of accident from causative acts done or

occurring within the scope or sphere of the employment. All acts reasonably necessary or incident to the performance of the work, including such matters of personal convenience and comfort, not in conflict with specific instructions, as an employee may normally be expected to indulge in, under the conditions of his work, are regarded as being within the scope or sphere of the employment." We think, under all the circumstances shown, that plaintiff was on the springboard for a purpose that was reasonably incidental to his work, and that the accident arose out of his employment.

Plaintiff went to Dr. James C. Maly, a local physician. Dr. Maly testified that he was the family doctor for the Uzendoski family. He testified that this 18-year-old boy had suffered some minor injuries, including ankle sprains, while playing football in high school, from which he had fully recovered. Dr. Maly obtained a history of the case from the plaintiff, which was the same as testified to by the plaintiff on the trial. Dr. Maly X-rayed plaintiff's ankles and found no evidence of bone fracture. He made a physical examination, bandaged plaintiff's ankles, and placed him on crutches. After 2 weeks plaintiff had made no improvement and he was referred to Dr. House, an orthopedist at Grand Island. He was informed by Dr. House that the latter felt plaintiff had a cartilaginous fracture and recommended that casts be put on the ankles to limit mobility. This was done by placing a walking-cast on the left leg for 4 weeks and an ordinary cast on the right leg for 5 weeks. When the casts were removed plaintiff's legs were still painful and swollen. Dr. Maly checked for evidence of rheumatic fever and rheumatoid arthritis and gout, and other diseases. He at first diagnosed the condition as arthritic gout, but, after nonresponsive treatment, withdrew this diagnosis. He finally diagnosed the condition as Sudek's atrophy, which is a reflex atrophy, highly sympathetic, and sympathetic dys-

trophy, which affect the nerves, muscles, arteries, bones, and the circulatory system.

Plaintiff desired to attend Creighton University in Omaha and, as a matter of convenience, plaintiff was referred to Dr. Richard J. Fangman of Omaha. Dr. Maly testified that Dr. Fangman recommended a lumbar sympathectomy, which was performed by Dr. Jerome Murphy of Omaha, the surgery being a nerve-clipping operation to alleviate the distrophy and produce better circulation in the leg. The left leg improved substantially after the operation. A similar operation was not performed to benefit the right leg because of resulting general health considerations. Circulation improved in the left leg, but the right leg remained cold, moist, and sweaty, all constituting evidence of dystrophy. Dr. Maly adhered to his diagnosis of Sudek's atrophy and gave it as his opinion that the permanent disability to the right leg is 40 percent and to the left leg, 30 percent.

Dr. Fangman testified that he first saw plaintiff on October 12, 1962, and had seen him 26 times thereafter, the last time, 2 days before the hearing. He also diagnosed plaintiff's condition as sympathetic dystrophy. He testified that there was substantial improvement in the left leg after the sympathectomy was performed. He stated that there was a substantial atrophy of the muscles and the bone structures of the feet; and that there was a decalcification of the bones observable by X-ray. He testified that a secondary diagnosis was hyperuricemia without clinical gouty arthritis and that the possibility exists that a clinical gouty arthritis may develop in the future which would be the result of the trauma. He called attention to the physical condition of the plaintiff who weighed a healthy 175 pounds before the accident and on October 12th, following, weighed but 135 pounds. He gave it as his opinion that plaintiff had suffered a permanent partial disability which he estimated at 50 percent to the right leg and 40 percent to the left leg.

The defendant offered the evidence of two physicians, Dr. Frank J. Iwersen and Dr. Harold A. Ladwig, both of Omaha. Dr. Iwersen is an orthopedic surgeon. He examined the plaintiff on March 29, 1963. He obtained substantially the same history as Drs. Maly and Fangman. He described the plaintiff as 19 years of age, 5 feet 10½ inches in height, and weighing 150 pounds at that time. He observed a marked atrophy of the left quadriceps, it being ¾ inch smaller in circumference than the right. There was weakness in the left knee, the plaintiff being unable to squat and rise without assistance because of such weakness. He observed the scars of the sympathectomy and found no evidence of circulatory disturbance at that time. He found a 25 degree plantar flexion of the left foot and 10 degrees of dorsiflexion of the left foot. The muscles of the right foot were normal, but the right foot was moist and clammy, while the left foot and leg were dry. There was a 25 degree plantar flexion of the right foot and 8 degrees of dorsiflexion. The calves of the legs showed no atrophy. He found no evidence of bone atrophy. He diagnosed the condition as post-traumatic reflex dystrophy of the lower extremities. It is his opinion that the atrophy could be eliminated by special physical exercise and therapy. He testified that when the recalcification of the bones once commenced, it was progressive and would not recede. The plaintiff informed him that he had a gouty arthritis, but he did not look for, or find, any evidence of it. He gave no evidence as to permanent disability, or percentage thereof, for the reason that much improvement was possible and maximum rehabilitation had not been reached.

Dr. Ladwig specialized in neurology. He examined the plaintiff on September 23, 1963, without the aid of X-rays. He found plaintiff's hands and right foot cold and moist. The left foot was warm and dry. He found the circulation in the feet to be good, the feet being pink in color with no abnormal skin effects. He diagnosed the

condition as a reflex type of dystrophy involving the lower extremities. It is the opinion of Dr. Ladwig that the only permanent partial disability is the residual result of the sympathectomy which is less than 10 percent. It is the evidence of Dr. Ladwig that the muscular atrophy can be corrected by proper physical exercises and other forms of therapy. It is his opinion also that the atrophy of the bones will be corrected by natural regeneration, progress in this direction having once commenced. It is his conclusion therefore that the only partial permanent disability in this case is the residual effect of the sympathectomy.

We have reviewed the evidence of the medical experts with some care because of the differences in professional opinions expressed by them. The case is tried in this court de novo, which requires this court to determine the weight of the evidence. We are fully aware that the number of witnesses does not necessarily determine where the weight of the proof lies. The compensation court accepted the evidence of Dr. Ladwig in preference to that of Dr. Maly and Dr. Fangman. It appears necessary to examine into the foundations supporting their expert opinions.

A review of the medical testimony reveals certain points of divergence and agreement which should be pointed out. There is some evidence in this record that plaintiff was afflicted with gout or a gouty arthritis. All the doctors testify that this disease is not caused by trauma; that it is a metabolic disorder not produced by physical injury. Dr. Maly first was of the opinion that plaintiff suffered from gout or a gouty arthritis but abandoned that diagnosis when plaintiff failed to respond to medication. No other doctor found any evidence of this disease. They all agree that reflex dystrophy, often referred to as Sudek's atrophy, is caused by trauma.

Dr. Ladwig and Dr. Iwersen were of the opinion that special physical exercise was necessary to proper treat-

ment.  Dr. Maly and Dr. Fangman were of the opposite opinion.  The plaintiff being in the care of the latter doctors followed their advice and abstained from all forms of exercise that he could avoid.  It is quite evident that if Dr. Ladwig's conclusion is correct the sympathectomy, the nerve-clipping operation on the left side of the back, was a useless operation.  When asked about that, his reply was:  "As is true in the field of law, there is always room for difference among physicians."  Incidental to this point, all of the medical experts are recognized by each other as competent, experienced physicians.  All of the physicians appear to agree that the condition was a reflex dystrophy, although Dr. Ladwig found no evidence of it when he examined the plaintiff on September 23, 1963.  They are in disagreement as to the use of physical exercise as a part of the treatment.  All concede that there was a muscular atrophy of the left quadriceps.  All agree that the plaintiff was disabled at the date of trial on January 23, 1964.

After a consideration of all the evidence, we come to the following conclusions:  The plaintiff was a young man of 18 years at the time of his injury.  He weighed approximately 175 pounds at that time and his weight was reduced to 135 pounds during treatment.  He has suffered pain and swelling of the ankles almost constantly from the date of the accident to the time of trial.  He has constantly been under the care of competent doctors.  He has been hospitalized, he has had his lower extremities in casts, he has used crutches, and he has been subjected to a sympathectomy.  As a result of the latter his left leg has shown substantial improvement.  He has been unable to work physically for more than 3 or 4 hours at a time.  He has pursued a course of instruction at Creighton University to fit himself for the medical profession.  He has required long periods of rest and was required to reduce the number of hours of college work.  He has complied with the directions of his

doctors and at the time of trial, more than 17 months later, he was still disabled.

Drs. Ladwig and Iwersen testified that physical exercise would alleviate the muscular atrophy, but it has not been done and remains a matter of opinion. Dr. Ladwig also stated that the bone atrophy could have been caused by casts placed on plaintiff's lower limbs or by mere disuse. Plaintiff's doctors state that the recovery of the muscular and bone atrophy is conjectural; and that in some persons natural regeneration will occur, and in others it will not. The improvement in the left leg after the sympathectomy is indicative to us of the seriousness of plaintiff's condition. The testimony of Drs. Maly and Fangman, in whose care the plaintiff has been for more than 17 months, showing continued weakness in the left knee and the continued muscular, bone, and circulatory weaknesses, leads us to the conclusion that plaintiff was partially disabled at the time of trial. That there is a probability of further substantial recovery is testified to by Drs. Ladwig, Iwersen, and Maly.

We think the evidence warrants a finding that the rehabilitation of this plaintiff is so incomplete that a determination of the partial permanent disability could not properly be made at the time of the trial. We find that the award for partial permanent disability is not supported by the evidence and such award is reversed.

It is provided by subsection (3) of section 48-121, R. R. S. 1943, that compensation for temporary disability shall cease as soon as the extent of the permanent disability is ascertained. This means that temporary disability should be paid to the time when it becomes apparent that the employee will get no better or no worse because of the injury. Under the evidence in this record the extent of the permanent injury is not ascertainable. Consequently, an award for such is not sustained by the evidence.

The plaintiff was still under treatment at the time of

the trial, he is still convalescing, he is still suffering from the injury, and he is still unable to work because of the accident. The situation is controlled by Allen v. Department of Roads & Irrigation, 149 Neb. 837, 32 N. W. 2d 740, wherein we said: "We are of the opinion that the phrase 'compensation for temporary disability shall cease as soon as the extent of the permanent disability is ascertained' means that temporary disability shall end when the condition becomes fixed. This simply means that in the present case temporary disability should be paid to the time when it becomes apparent that the arm will get no better or no worse because of the injury. Temporary disability contemplates the period the employee is submitting to treatment, is convalescing, is suffering from the injury, and is unable to work because of the accident. Temporary disability ordinarily continues until the employee is restored so far as the permanent character of his injuries will permit."

We reverse the judgment of the district court and remand the cause with directions to reverse the award of the compensation court with instructions to that court to vacate its award and enter a further award for temporary disability and, when temporary disability ceases, to hold a further hearing to determine the permanent disability, if any, due the plaintiff under the Nebraska Workmen's Compensation Act.

REVERSED AND REMANDED WITH DIRECTIONS.