JOHN C. BINDRUM, APPELLANT, V. FOOTE & DAVIES AND LIBERTY MUTUAL INSURANCE CO., APPELLEES.

457 N.W.2d 828

Filed July 20, 1990.    No. 89-1450.

T.J. Hallinan, of Cobb, Hallinan & Ehrlich, P.C., for appellant.

Jay L. Welch and Alan M. Thelen, of Rickerson, Welch & Kruger, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Plaintiff, John C. Bindrum, appeals from an award of the Workers' Compensation Court on his petition for compensation benefits as the result of an accident arising out of and in the course of his employment with defendant-appellee Foote & Davies, a commercial printing firm. Bindrum assigns as error, in summary, (1) the compensation court's finding that he reached maximum medical recovery as of December 12, 1988, and (2) its failure to award him temporary total disability benefits from December 13, 1988, until such time as he successfully completes vocational rehabilitation and has been returned to the work force. We direct that the judgment of the compensation court be affirmed as modified by this opinion.

Bindrum, a high school graduate who was 35 years old at the time of the trial from which this appeal was taken, sustained injury on October 28, 1987, when a defective wrench he was using to tighten a roll of paper in connection with his duties as a

"second perfecting operator" slipped and, in his words, "wrenched [his] upper back between [his] shoulder blades, up around [his] left shoulder," as the result of which he felt "kind of a pulled muscle type tearing sensation." He nonetheless continued performing the same duties at work until early November 1987, when he was moved to a job involving lighter duty and consequently less pay. Effective January 4, 1988, Bindrum was demoted because of his poor performance. Sometime in September or October 1988, he was dismissed because of his inability to perform the necessary work. According to a stipulation of the parties, Bindrum was temporarily totally disabled from the time he was discharged until at least December 12, 1988.

Bindrum participated in physical therapy from January 14 until February 2, 1988. At the end of that time, his physical therapist stated: "Objectively, I have difficulty finding a problem with [Bindrum's] back, either at the musculotendinous or spinal joint areas. I am also not sure how much effect the present physical therapy is having on his problem." Accordingly, physical therapy was discontinued.

On February 10, 1988, Bindrum was examined by Dr. Paul G. Dworak, an orthopedic surgeon, who determined that Bindrum suffered "diffuse interscapular pain" and that his "symptoms seem to be more of a ligamentous nature and this is sometimes very difficult to totally alleviate." As of March 1, 1988, Dworak recommended that Bindrum remain "on light duty at work for the next month to allow this ligamentous/muscular disorder to heal itself since it has been going on for a significant amount of time." Subsequently, in an October 7, 1988, letter to the claim representative for defendant-appellee Liberty Mutual Insurance Co., the workers' compensation insurance carrier for Foote & Davies, Dworak stated:

> When I examined Mr. Bindrum the vast majority of his clinical symptoms seemed to be secondary to mild fascial etiology of his interscapular pain. . . . Prior to being seen by myself he had undergone a work hardening program in physical therapy . . . which did not prove to be very beneficial.

> Finally we underwent an MRI scan of his thoracic spine
> . . . . There is absolutely no evidence of any disc
> herniation.
>     . . . [W]e are reaching maximum medical benefit since
> he still has persistent symptoms almost a year to the date.
> He has exhausted all medical treatment to the present
> time.

Dworak suggested that Bindrum consider vocational rehabilitation if unable to return to previous employment.

Dr. John C. Yeakley, also an orthopedic surgeon, examined Bindrum on December 12, 1988, and stated in a letter to Bindrum's attorney that he was unable to detect any neurological impairment of Bindrum's spine and diagnosed Bindrum as suffering "from a posttraumatic myofascial pain syndrome involving the paravertebral and periscapular musculature of the mid and upper thoracic region." According to Yeakley, Bindrum's condition "is due directly to the injury in question . . . ." Yeakley recommended "oral anti-inflammatory medications, physical therapy on an intermittent basis as necessary, work activities within his tolerance limits, and avoidance of any heavy lifting and carrying, twisting of the trunk, stooping, and working at shoulder level or above." Yeakley stated, "I see no indication for further diagnostic studies nor do I feel that his problem is amenable to surgical intervention."

Subsequently, in a February 3, 1989, letter to Foote & Davies' attorney, Yeakley stated that because he had not examined Bindrum since December 12, he was unaware of Bindrum's current condition and therefore was unable to determine whether Bindrum "has reached maximum medical benefit." Yeakley reported: "As of the time I last saw him, I would consider him to have a 3 percent permanent physical impairment in the body as a whole due to his strain injury."

Dworak also evaluated Bindrum's permanent physical impairment and determined, according to a February 14, 1989, letter to Foote & Davies' attorney: "[Bindrum] would be rated at 3.5 percent permanent physical impairment and loss of physical function to the whole body. This rating is based upon pain associated with chronic muscle spasm. . . . He had

essentially reached maximum medical improvement after his last office visit and completion of the MRI scan findings." According to Dworak's office notes and a letter written on October 7, 1988, Bindrum's last office visit occurred on September 21, 1988, the MRI scan was conducted on October 5, and the results of the MRI scan were received at least by October 7.

On February 27, 1989, Yeakley prescribed physical therapy for Bindrum. Bindrum participated in physical therapy from March 7 until May 1, 1989. As of May 10, 1989, Yeakley recommended that Bindrum return to work with certain restrictions such as that Bindrum avoid lifting or carrying over 25 pounds; stooping, bending, or twisting his trunk; activities "using the upper extremities which require persistent heavy gripping or rapid alternating movements of the hands and forearms"; working at shoulder level or above; and assuming unusual positions, and that Bindrum limit squatting, kneeling, and crawling.

In a report dated May 18, 1989, Dr. Thomas R. Estes, Jr., a neurosurgeon who examined Bindrum on May 16, 1989, stated: "Mr. Bindrum's disability rest[s] solely on his subjective reporting of his limitation. There is nothing on his physical examination, nor his carriage, nor his demeanor, while being interviewed that indicate[s] the degree nor the source of his discomfort." Estes testified that as of May 25, 1989, Bindrum had "achieved maximum medical healing" and that there was no medical reason Bindrum could not return to work. Estes recommended, however, that Bindrum not return to work until "he feels he is able to complete the activities related to his work without the further exacerbation of pain . . . ." Estes also recommended that when Bindrum returned to work, he should operate "within his tolerance limits," avoid heavy lifting or twisting, avoid work at shoulder level or above, and participate in work which allows a frequent change in position. Estes noted that the activities Bindrum stated he was able to perform at home were in direct contradiction to the work restrictions placed on Bindrum by his physicians and to the work activities Bindrum stated he could perform. When questioned by Bindrum's attorney, Estes agreed that Bindrum was restricted

from performing "heavy labor" because of his back pain and that Bindrum required retraining so that he could perform a job involving lighter work.

Bindrum contacted the Nebraska Division of Rehabilitation Services in May 1989 and completed a vocational evaluation from July 24 through July 26, 1989. In a September 13, 1989, letter to Bindrum's attorney, a counselor with the Division of Rehabilitation Services stated that although she had met weekly with Bindrum to assist him in obtaining suitable employment, he had not yet had an interview for a potential position. The counselor stated that if Bindrum were unable to obtain an appropriate employment situation, it would be in his "best interests to look into school programs at Southeast Community College," but that because Bindrum was unable, after vocational evaluation and counseling, to decide on a specific program of education, "the most appropriate plan would be to arrange for an on-the-job training in a technical field which is consistent with [Bindrum's] assets, limitations and preferences."

At the request of Foote & Davies' insurance carrier, Bindrum sought vocational rehabilitation services from Career Design, Inc., a vocational rehabilitation specialist. Bindrum participated in interviews at Career Design on May 3 and June 5, 6, and 7, 1989. The vocational rehabilitation specialist concluded that with vocational rehabilitation Bindrum would be capable of earning as much as he did at the time of his injury. Career Design prepared a vocational evaluation report dated July 17, 1989, which formulates two possible rehabilitation plans for Bindrum. One such plan involves placement in an area directly related to Bindrum's work history. The other plan contemplates placement in an area indirectly related to Bindrum's work history for which Bindrum may require on-the-job training for a 6-month period and would receive temporary total disability benefits during the training period. According to the report, under either plan Bindrum's loss of earning capacity is no greater than 5 percent. The report states that "Mr. Bindrum did not appear to be particularly interested in determining a vocational goal."

According to Bindrum, all of the jobs he has held, including

his employment at Foote & Davies, have involved heavy, strenuous work. Bindrum testified that until the injury in 1987, he had no serious back problems. Since the time of the injury, Bindrum stated he has continued to experience pain similar to that he initially experienced. He testified that on some days he has less pain than on others and that on bad days he is unable to do anything. Bindrum further stated that he is able to sit for an hour, but with some discomfort. According to Bindrum, he is able to participate in certain activities at home, such as mowing the lawn, changing the oil in his motor vehicle, fixing up the house, and housekeeping chores, if he "rest[s] in between."

The compensation court awarded Bindrum benefits for temporary partial loss of earning power during the periods he continued to work, but during which he received demotions, and for temporary total disability after he was discharged from work until December 12, 1988, and determined that after December 12, 1988, Bindrum was entitled to benefits for a 5-percent loss of earning power. The compensation court also awarded Bindrum vocational rehabilitation involving assistance from Career Design in obtaining job placement, with the provision that if such placement were not successful within a reasonable period of time, Career Design was to assist Bindrum in arranging for on-the-job training. The compensation court further awarded temporary total disability benefits for the 7 days in 1989 during which, prior to the court's award of rehabilitation, Bindrum underwent testing to develop an appropriate voluntary plan of vocational rehabilitation.

Bindrum's initial contention is that the compensation court erred in terminating his temporary total disability benefits as of December 12, 1988, and in determining his permanent loss of earning power. Implicit in the compensation court's judgment is the finding that as of December 12, 1988, Bindrum had attained maximum medical recovery. When an employee has reached maximum recovery, his or her remaining disability is permanent, and such employee is no longer entitled to compensation for temporary disability. *Carter v. Weyerhaeuser Co.*, 234 Neb. 558, 452 N.W.2d 32 (1990); *Gardner v. Beatrice Foods Co.*, 231 Neb. 464, 436 N.W.2d 542 (1989).

The question of whether an injured employee has reached

maximum medical improvement is a question for the Workers' Compensation Court as trier of fact. *Carter v. Weyerhaeuser Co., supra.* Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 1988), findings of fact by the Workers' Compensation Court have the effect of a verdict in a civil case, and its judgment may not be set aside on appeal where there is evidence sufficient to support it; however, findings of the Workers' Compensation Court which are not supported by credible evidence and are clearly wrong will be set aside. *Sherwood v. Gooch Milling & Elevator Co., ante* p. 26, 453 N.W.2d 461 (1990); *Kleiva v. Paradise Landscapes*, 230 Neb. 234, 430 N.W.2d 550 (1988). In testing the sufficiency of the evidence to support the findings of fact made by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party. *Martinez v. Nebraska Dupaco, ante* p. 720, 457 N.W.2d 285 (1990); *Fenster v. Clark Bros. Sanitation, ante* p. 336, 455 N.W.2d 169 (1990); *Sherwood v. Gooch Milling & Elevator Co., supra.* As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Martinez v. Nebraska Dupaco, supra*; *Brazee v. City of Lincoln*, 234 Neb. 680, 452 N.W.2d 529 (1990); *Carter v. Weyerhaeuser Co., supra.*

It is true, as Bindrum points out, that Yeakley's letter dated December 12, 1988, does not support a finding that Bindrum had obtained maximum medical healing as of that date. Although Yeakley states that further diagnostic studies and surgical intervention would be unavailing, he also prescribes physical therapy, medication, and limitations on work activities. Nowhere in his letter does Yeakley state that Bindrum has attained maximum medical recovery. In fact, in his later February 3, 1989, letter, Yeakley states that he was unaware of Bindrum's current condition and therefore was unable to determine "whether or not [Bindrum] has reached maximum medical benefit." The record, however, does support a finding, based upon Dworak's opinion, that Bindrum had reached maximum medical improvement by an earlier date, October 7, 1988. However, the parties stipulated that Bindrum was entitled to benefits for temporary total disability until December 12, 1988. Therefore, from the compensation court's order

terminating temporary total disability after December 12, 1988, it can be inferred that the court determined that Bindrum had attained maximum medical recovery as of October 7, 1988, but, pursuant to the parties' stipulation, was entitled to temporary total disability until December 12, 1988. There is nothing clearly wrong in that determination.

Bindrum next contends that he should have received temporary total disability benefits during the time he voluntarily accepted the rehabilitative services his employer voluntarily offered prior to the compensation court's award of such services. We disagree.

It is true that the Workers' Compensation Act contemplates that an employer may voluntarily offer and the employee voluntarily accept rehabilitative services. See Neb. Rev. Stat. § 48-162.01(3) (Reissue 1988). It is also true that Neb. Rev. Stat. § 48-121(5) (Reissue 1988) provides: "The employee shall be entitled to compensation from his or her employer for temporary disability while undergoing rehabilitation" and that § 48-162.01(3) provides, in part:

> When as a result of [an injury covered by the Nebraska Workers' Compensation Act] an employee is unable to perform work for which he or she has previous training or experience, he or she shall be entitled to such vocational rehabilitation services, including retraining and job placement, as may be reasonably necessary to restore him or her to suitable employment. If such services are not voluntarily offered and accepted, the Nebraska Workers' Compensation Court or any judge thereof on its or his or her own motion, or upon application of the employee or employer, and after affording the parties an opportunity to be heard by the compensation court or judge thereof, may refer the employee to a qualified physician or facility for evaluation and report of the practicability of, need for, and kind of service, treatment, or training necessary and appropriate to render him or her fit for a remunerative occupation . . . .

However, we do not read these subsections to contemplate that an employee is entitled to temporary disability benefits while undergoing rehabilitation voluntarily offered by the employer.

Such an interpretation would defeat one of the act's primary purposes, which is "restoration of the injured employee to gainful employment." § 48-162.01(1). An employer would be discouraged from voluntarily offering rehabilitative services if by so offering it would become obligated to provide temporary disability benefits. As stated in *Carter v. Weyerhaeuser Co., supra* at 564, 452 N.W.2d at 37: "[I]t has long been the policy of this court to construe the Nebraska Workers' Compensation Act liberally so that its beneficent purposes may not be thwarted by technical refinements of interpretation." Therefore, we read §§ 48-121(5) and 48-162.01(3) to mean that an employee, unless he or she is otherwise qualified to receive temporary total disability benefits, is entitled to such benefits only while undergoing rehabilitation which has been ordered by the compensation court.

Under this rule, Bindrum is not entitled to the temporary total disability benefits the compensation court awarded him for the 7 days in 1989, prior to the award of rehabilitation, on which days Bindrum was undergoing testing for purposes of determining an appropriate vocational rehabilitation plan. Nevertheless, because the defendants do not contest that award, we do not modify the compensation court's judgment in that regard.

Bindrum further contends that he is entitled to temporary total disability benefits during the time that he undergoes vocational rehabilitation pursuant to the compensation court's award, notwithstanding the fact that the extent of his loss of earning power has been determined, and that the court erred in failing to award him such benefits.

In order to resolve this claim, we must first determine whether the compensation court's award of rehabilitation is appropriate. Such a determination requires us to answer two questions: Is Bindrum entitled to vocational rehabilitation? Do direct job placement and on-the-job training constitute vocational rehabilitation?

We have held, based upon § 48-162.01(3) and (6), that an employee is entitled to vocational rehabilitation benefits when, as the result of a compensable injury, he or she is unable to perform work for which he or she has previous training or

experience or when there is a reasonable probability that such rehabilitation will reduce the amount of earning power loss the employee would otherwise suffer. *Sherwood v. Gooch Milling & Elevator Co., ante* p. 26, 453 N.W.2d 461 (1990); *Thom v. Lutheran Medical Center*, 226 Neb. 737, 414 N.W.2d 810 (1987). See, also, *Martinez v. Nebraska Dupaco, ante* p. 720, 457 N.W.2d 285 (1990). We have also held that whether an injured employee is entitled to vocational rehabilitation is a question of fact to be determined by the Workers' Compensation Court. *Sherwood v. Gooch Milling & Elevator Co., supra.* Since the compensation court did not find Bindrum to be totally disabled, a condition which exists when an employee is unable to earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform, or any other kind of work which a person of his or her mentality and attainments could perform, *Kleiva v. Paradise Landscapes*, 230 Neb. 234, 430 N.W.2d 550 (1988), it must be inferred that the court concluded there is a reasonable probability that rehabilitation will reduce the amount of loss of earning power Bindrum has suffered. While one can certainly question how much one who has suffered such a minimal reduction in earning power can be helped, Bindrum's declarations of pain, the restrictions Yeakley and Estes placed upon Bindrum's work activities, Estes' acknowledgment that Bindrum was restricted from performing "heavy labor" because of his back pain and that Bindrum required retraining so that he could perform a job involving lighter work, and the vocational rehabilitation specialist's statement that with vocational rehabilitation Bindrum could obtain a job paying as much as he was earning at the time of his injury, marginally support the compensation court's finding in that regard.

As to the second question, Do direct job placement and on-the-job training constitute vocational rehabilitation? we have recently concluded that a plan of direct job placement, at least when prescribed as the only form of appropriate vocational rehabilitation for an injured employee, is vocational rehabilitation within the meaning of § 48-121(5) and therefore entitles such an employee to temporary disability benefits.

*Carter v. Weyerhaeuser Co.*, 234 Neb. 558, 452 N.W.2d 32 (1990). Both the Division of Rehabilitation Services and Career Design recommended direct job placement and on-the-job training as the most appropriate plan of rehabilitation for Bindrum. Therefore, the compensation court's award of services to Bindrum in the form of assistance in obtaining job placement or in arranging on-the-job training is an appropriate award of rehabilitation and is supported by the evidence.

Because the award of rehabilitation was appropriate, Bindrum is, as he contends, entitled to temporary total disability payments during the period he is involved in rehabilitation.

Although the defendants ostensibly argue that § 48-121(5) is to be read as meaning that an employee is entitled to compensation only for the actual time spent in receiving rehabilitative services, such is not the case. We have defined "temporary disability," as used in § 48-121(3), which provides that compensation for temporary disability shall cease when the extent of permanent disability is ascertained, as the period during which an injured employee is submitting to treatment, convalescing, suffering from injury, and unable to work because of the accident. *Uzendoski v. City of Fullerton*, 177 Neb. 779, 131 N.W.2d 193 (1964). Thus, under § 48-121(5), an injured employee is entitled to compensation for such reasonable period of time as is spent undergoing rehabilitation and he or she is therefore unable to work. See *Gardner v. Beatrice Foods Co.*, 231 Neb. 464, 470, 436 N.W.2d 542, 546 (1989): "There is no question but that Neb. Rev. Stat. §§ 48-121(5) and 48-162.01 (Reissue 1988) provide that an employee is entitled to temporary total disability benefits and, where appropriate, travel and living expenses *while undergoing rehabilitation.*" (Emphasis in original.)

*Carter v. Weyerhaeuser Co., supra*, establishes that even when the rehabilitation is in the form of direct job placement, the employee is entitled to temporary total disability benefits.

Because we determine that Bindrum is entitled to temporary total disability benefits while undergoing the vocational rehabilitation ordered by the compensation court, it is necessary to suspend the payment of benefits for the 5-percent

loss of earning capacity the compensation court determined Bindrum has presently suffered. At the conclusion of the rehabilitative effort, it will be necessary for the compensation court to determine whether the effort was successful and in fact reduced the loss of earning power Bindrum presently suffers. See *Thom v. Lutheran Medical Center, supra.*

Accordingly, we direct that the award of the compensation court be modified in accordance with this opinion and, as so modified, affirmed.

AFFIRMED AS MODIFIED.