MICHAEL GIBSON, APPELLEE, V. KURT MANUFACTURING AND SAFECO, ITS WORKERS' COMPENSATION CARRIER, APPELLANTS.

573 N.W. 2d 786

Filed January 13, 1998.    No. A-97-572.

John R. Hoffert, of Knudsen, Berkheimer, Richardson, Endacott & Routh, for appellants.

Samuel W. Segrist, of Meister & Segrist, for appellee.

HANNON, SIEVERS and INBODY, Judges.

HANNON, Judge.

The issues presented by this workers' compensation case are whether the claimant, Michael Gibson, is entitled to vocational rehabilitation and whether a Workers' Compensation Court can postpone a determination of a claimant's loss of earning capacity until the claimant completes vocational rehabilitation. We find in the affirmative on both issues and, therefore, affirm in part and reverse in part the judgment of the review panel.

## FACTUAL BACKGROUND

Gibson began working for Kurt Manufacturing, a metal fabrication company, in late June or early July 1991 after he graduated from high school. For the most part, Gibson worked as a screw-machine operator, which required him to keep the machine supplied with steel, to check the quality of the product, and to move trays of parts (screws). The position entailed a significant amount of lifting, carrying, and pushing, sometimes with the help of a sledge hammer, large and heavy pieces of steel which ranged from approximately 400 pounds down to 25 pounds. The larger machines, such as the "4-inch" machine, used the heaviest pieces, while the "9/16ths" machine used the lightest pieces of steel. Gibson testified that he usually ran two machines at once. His hourly wage in February 1993 was $7.35.

At a little before midnight on February 25, 1993, Gibson was pulling on a handle on the collet lever of an "inch and 5/8ths"

screw machine when he felt a pain in his midback between his shoulder blades. Gibson described the pain as similar to being stuck by an ice pick. Gibson informed his supervisor of his injury and went home. When Gibson left work, he was experiencing back spasms and muscle tightness around his ribs. By 5 or 6 a.m., the pain was so great that Gibson went to the emergency room. Gibson later visited his family practitioner, Dr. Milton (Pete) Johnson. Johnson's notes from March 10 reveal that a bone scan showed a slight area of increased activity in the T-8 location of Gibson's spine and that Johnson suspected Gibson had sustained either a very small compression fracture or a bony type of injury at that location.

After going through physical therapy, Gibson returned to work on April 26, 1993. Gibson's muscle spasms had relaxed, but he still experienced pain in his spine. Gibson worked on the 9/16ths machine, which he described as the "real small screw machine." Operation of that machine required him to use 25 pound pieces of steel, which were substantially lighter pieces of steel than he had been using prior to the accident. Gibson also had other employees carry his parts trays, which weighed between 45 and 50 pounds, for him. Gibson continued working on the smaller screw machines that summer. According to Gibson, despite the fact that he returned to work, he continued to have pain in the center of his back.

On August 2, 1993, while at home, Gibson experienced a reoccurrence of the pain in his back. Due to his midback pains, Gibson did not go back to work. Instead, Gibson returned to Johnson, who referred him to Dr. Donn Turner, a neurosurgeon in Fort Collins, Colorado. In addition to his midback pain, Gibson reported having spasms down toward his lower back, pain in his neck, numbness in his legs, and shooting pains down his legs. According to Gibson, his right leg was numb and real heavy, and his left foot was also numb. Turner diagnosed Gibson as having sustained "a prominent disc fragment at T7-8, midline and to the right of midline, in association with narrowing of this interspace."

In September or October 1993, Gibson developed what he described as cramps in his calves. In November, Gibson underwent a functional capacity assessment, which is generally summarized by the following:

Please note that during the Assessment Mr. Gibson was consistently limited during lifting activities by reports and behaviors of mid-back pain. He also demonstrated increased difficulty with functional activities requiring flexed postures. Body mechanics with lifting were at times poor with the client attempting to control the weight while holding it away from his center of gravity. Heart rate response tended to be elevated and reports of pain ended [sic] to increase throughout the assessment indicating general deconditioning. He also had decreasing resistance values throughout the test . . . . Mr. Gibson also had frequent reports of pain and stiffness in the right calf with functional activities. His reports did not appear to be consistent with radicular symptoms and he reported that he intends to see his family physician before starting the Work Hardening program.

Additionally, the report revealed that Gibson could only "occasionally," defined as 1 to 33 percent of an 8-hour workday, lift the following weights: from 30 to 63 inches in height and return, 23.6 pounds; from 30 to 18 inches in height and return, 36.8 pounds; and from 18 inches to floor and return, 32.4 pounds. The report further revealed that he could only occasionally carry 22 pounds with each arm and that he could only occasionally push and pull 44.1 pounds. We note, with regard to these categories, that Gibson complained of midback pain but not leg pain.

Gibson participated in a "work hardening" program in late November through December 1993, although his attendance was sporadic. Gibson was still having back pain, but he also began noticing more problems with his legs, including numbness, heavy feelings, and cramps. Gibson left the work hardening program toward the end of December when he developed blood clots in his legs, a condition for which he was hospitalized on December 30. Gibson was diagnosed as having deep venous thrombosis. According to Gibson, when he left the work hardening program, he did not think that his back had "improved at all."

Gibson did not return to work at Kurt Manufacturing again until April 18, 1994. When he did return, he performed light-

duty jobs such as sorting parts and working with the smaller screw machines. However, he was still having pain in his middle and lower back. Gibson worked until July 26, when he was taken off work for his vein problems. In September, Johnson advised Gibson not to return to work because of his recurrent deep venous thrombosis. According to Gibson, Johnson eventually came to the conclusion that Gibson could return to work if he alternated standing and sitting and was allowed to put his leg up.

Gibson returned to Kurt Manufacturing on May 15, 1995, and worked as a tool grinder, a tool builder, and an office clerk (the latter at a wage of $7.48 per hour), all physically less demanding jobs. Gibson never returned to the screw machine operator job because of his vein problems. Gibson was laid off on March 15, 1996, because of what he described as having "too many claims on the insurance." During that time, Gibson's back was "still real painful up between the shoulders." In May, Gibson was hired by a credit bureau to do telephone and computer work at a wage of $5 per hour. Gibson worked there until his termination on September 2 or 3. Gibson testified that his back bothered him when he worked at the credit bureau.

In a July 29, 1996, impairment rating, Dr. Michael Curiel stated:

> IMPRESSION: This patient has had a thoracic spine injury with evidence of thoracic disc herniation that has not required any surgery but has documented pain and rigidity with muscle spasm . . . . [T]he patient has a 6% Whole Person impairment. . . . Although the deep vein thrombosis certainly limits his work, there is no way to clearly associate this with his initial injury . . . . Therefore I cannot include that as part of the Impairment Rating.

Additionally, Dr. Glen Forney, in an August 19, 1996, letter, stated that Gibson had permanent physical impairment from his "post phlebitic syndrome" but did not give a degree of impairment.

At the time of trial in September 1996, Gibson was still experiencing pain in his midback "on my spine," as well as some occasional muscle spasms. Gibson admitted that the only medical treatment that he had received for his back problem was

medication, two rounds of physical therapy, and the work hard-
ening program and that since December 1993, all the treatment
he had received was for his deep venous thrombosis. Gibson
testified that if his thrombosis did disappear, he could return to
work at the 9/16ths machine if he had help lifting the parts
trays. Gibson testified that after his back injury, he had his
friends help lift things for him.

## PROCEDURAL BACKGROUND

On April 1, 1996, Gibson filed his petition for workers' com-
pensation benefits against Kurt Manufacturing and Safeco, its
workers' compensation carrier, specifically asking for voca-
tional rehabilitation. The trial judge found that the thoracic disk
herniation arose out of and in the course of Gibson's employ-
ment with Kurt Manufacturing and that his deep venous throm-
bosis was not related to his injury of February 26, 1993. The
judge also acknowledged Curiel's opinion that Gibson had sus-
tained a 6-percent functional disability to the body as a whole
as a result of the thoracic disk herniation. The trial judge
awarded temporary total disability benefits and ordered Gibson
to contact the rehabilitation specialist of the court for "an eval-
uation and recommended rehabilitation services." According to
the court:

> The issues in this case are what is plaintiff's loss of
> earnings power and is plaintiff entitled to rehabilitation
> services of the court. After plaintiff's injury, plaintiff
> returned to work on a lighter machine. Plaintiff was unable
> to do the work and suffered a reoccurrence which required
> plaintiff to discontinue work and seek further medical
> treatment. It was during the course of that medical treat-
> ment that deep vain [sic] thrombosis was discovered. It
> was also during this time that plaintiff underwent a func-
> tional capacity assessment which showed significant limi-
> tations. Even though a work hardening program may have
> increased plaintiff's ability to work, he would still have a
> substantial loss of earnings capacity if he had completed
> the work hardening program. I find that it is not appropri-
> ate at this time to determine plaintiff's loss of earnings
> capacity. Before determining any loss of earnings capac-

ity, it is necessary that plaintiff seek the rehabilitation services of the court. It is expected that those rehabilitation services will consist of retraining this young man with his significant back injury. After retraining which most likely will be an educational plan, the parties can either agree as to the plaintiff's loss of earning power. If the parties cannot agree, either party may apply to the court for further hearing.

The defendants then appealed to the review panel, arguing that the trial judge erred in awarding vocational rehabilitation benefits. According to the order, Gibson cross-appealed, arguing that the trial judge erred in not determining loss of earning capacity. The review panel found that the trial judge was clearly wrong in not assessing a loss in earning capacity as Gibson had reached maximum medical improvement and had received an impairment rating with restrictions at the time of trial. The review panel thus remanded the matter to the trial court for a determination of permanent loss of earning capacity. The panel also remanded the case for "clarification and findings as to whether the severe vein thrombosis suffered by the plaintiff after the accident and which was found by Dr. Curiel . . . to be not work related has any effect on the issue of vocational rehabilitation." Last, the review panel affirmed the trial judge's denial of Gibson's claim for payment of Curiel's bill in the amount of $350.

## ASSIGNMENTS OF ERROR

The defendants contend that (1) the trial judge erred in awarding vocational rehabilitation benefits to Gibson and (2) the review panel erred when it ordered the trial judge to determine Gibson's loss of earning capacity prior to his completion of vocational rehabilitation.

## STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 1993), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the

order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Winn v. Geo. A. Hormel & Co.*, 252 Neb. 29, 560 N.W.2d 143 (1997). In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the single judge who conducted the original hearing. *Id.*

■ Findings of fact made by the Workers' Compensation Court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Id.*

■ An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id.*

## ANALYSIS

This case presents two issues: (1) whether Gibson is entitled to vocational rehabilitation and (2) whether a determination on loss of earning capacity can be postponed until after the claimant completes vocational rehabilitation.

### *Is Gibson Entitled to Vocational Rehabilitation?*

First, we note that Neb. Rev. Stat. § 48-162.01 (Reissue 1993), which went into effect approximately 10 months after Gibson's work-related accident, was amended to operate from and after January 1, 1994, so as to provide, among other things, a means of determining a vocational rehabilitation plan and a means of determining loss of earning power. *Stansbury v. HEP, Inc.*, 248 Neb. 706, 539 N.W.2d 28 (1995). In *Stansbury*, the Nebraska Supreme Court held that the amendments to § 48-162.01, and in particular subsection (3), were procedural in nature and thus binding upon a tribunal on the effective date of the amendment. Thus, we apply § 48-162.01.

Subsection (3) of that statute provides, in relevant part, as follows:

> An employee who has suffered an injury covered by the Nebraska Workers' Compensation Act shall be entitled to prompt medical and physical rehabilitation services. When as a result of the injury an employee is unable to perform suitable work for which he or she has previous training or experience, he or she shall be entitled to such vocational rehabilitation services, including job placement and

retraining, as may be reasonably necessary to restore him or her to suitable employment.

A determination as to whether there is a reasonable probability that vocational rehabilitation services would reduce the amount of earning power lost by an injured worker is a question of fact to be determined by the Workers' Compensation Court. *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996).

At trial, Gibson testified that he still experiences pain in his midback, along with occasional muscle spasms. While it is undisputed that Gibson was having problems with his legs in November 1993 when the functional capacity assessment was performed, the report reveals that during the specific portions of the assessment which tested his capacity for lifting, carrying, pushing, and pulling, Gibson complained only of pain in his midback. Moreover, the results from those portions of the assessment show that, at a maximum, Gibson is able to lift 36.8 pounds, carry 22 pounds in each arm, and push and pull 44.1 pounds. The defendants rely on the fact that Gibson admitted that if he did not have deep venous thrombosis, he could return to work at the 9/16ths machine if he received help from his coemployees in carrying parts trays that weighed 45 to 50 pounds. We cannot assume that Gibson will always be able to receive help from his "buddies" or that other employers will make special exceptions or provide help for him. His deep venous thrombosis aside, there is evidence that he could not perform all the duties of his job, even at the lightest machine, and therefore, we cannot say that the trial judge's determination that Gibson was entitled to vocational rehabilitation was clearly erroneous. The judgment of the review panel, remanding the determination of vocational rehabilitation to the trial judge, is thus reversed.

*Loss of Earning Capacity.*

The parties are at odds as to the time that loss of earning capacity is to be determined. The defendants contend that loss of earning capacity cannot be determined until after the employee completes vocational rehabilitation, and Gibson contends that such a determination can be, and should have been, made at the time of trial.

We have found cases where the trial judge simultaneously determined an employee's loss of earning capacity and awarded vocational rehabilitation. See, e.g., *Cords, supra* (affirming trial judge's award for 10-percent loss of earning power and vocational rehabilitation benefits); *Stansbury, supra* (where trial judge awarded benefits for 10-percent loss of earning capacity and for 12-week period of vocational rehabilitation); *Nunn v. Texaco Trading & Transp.*, 3 Neb. App. 101, 523 N.W.2d 705 (1994) (determination of loss of earning capacity made before completion of vocational rehabilitation); *Haney v. Aaron Ferer & Sons*, 3 Neb. App. 14, 521 N.W.2d 77 (1994) (after determining loss of earning capacity, court awarded vocational rehabilitation benefits). However, the timing of the award for loss of earning capacity was not challenged in those cases.

The Nebraska Supreme Court did discuss the timing of the determination of loss of earning capacity and its relationship with vocational rehabilitation in *Thom v. Lutheran Medical Center*, 226 Neb. 737, 414 N.W.2d 810 (1987). In *Thom*, the compensation court found that the employee had suffered a loss of earning power and was entitled to vocational rehabilitation. In affirming the compensation court's award of vocational rehabilitation services, the court stated:

> Since the effort at rehabilitation is aimed at reducing the earning power loss [the employee] presently suffers, the compensation court properly suspended payment of benefits for said present loss and awarded compensation for temporary total disability during the period of vocational rehabilitation. *At the conclusion of the rehabilitative effort, the extent of [the employee's] loss of earning power will need to be reconsidered.* § 48-162.01.

(Emphasis supplied.) *Thom*, 226 Neb. at 743, 414 N.W.2d at 815.

Similarly, in *Bindrum v. Foote & Davies*, 235 Neb. 903, 457 N.W.2d 828 (1990), the compensation court determined that the employee had sustained a 5-percent loss of earning power and awarded vocational rehabilitation benefits. The Nebraska Supreme Court upheld the award of vocational rehabilitation, stating:

> Because we determine that [the employee] is entitled to temporary total disability benefits while undergoing the

vocational rehabilitation ordered by the compensation court, it is necessary to suspend the payment of benefits for the 5-percent loss of earning capacity the compensation court determined [the employee] has presently suffered. *At the conclusion of the rehabilitative effort, it will be necessary for the compensation court to determine whether the effort was successful and in fact reduced the loss of earning power [the employee] presently suffers.*

(Emphasis supplied.) *Id.* at 914-15, 457 N.W.2d at 836.

Gibson argues that *Thom, supra,* and *Bindrum, supra,* are no longer applicable, because they were decided under the previous version of the statute, see Neb. Rev. Stat. § 48-162.01(6) (Reissue 1988). However, Gibson does not specify the changes which he contends justify such a conclusion. After viewing § 48-162.01(6) (Reissue 1988), we are unable to agree with Gibson's argument. Further, he overlooks the fact that the goal of vocational rehabilitation is to restore the injured employee to gainful employment, see § 48-162.01(1) (Reissue 1993), which may, if successful, reduce the injured employee's loss of earning capacity. The fact that the injured employee may have reached maximum medical improvement does not bar an award for vocational rehabilitation. See, e.g., *Stansbury v. HEP, Inc.,* 248 Neb. 706, 539 N.W.2d 28 (1995); *Bindrum, supra.*

It is important not to confuse physical impairment with earning capacity. An employee's disability as a basis for compensation is determined by the employee's diminution of employability or impairment of earning power or earning capacity and is not necessarily determined by a physician's evaluation and assessment of the employee's loss of bodily function. *Heiliger v. Walters & Heiliger Electric, Inc.,* 236 Neb. 459, 461 N.W.2d 565 (1990). At its simplest, the former is a limitation on what the body can do, and the latter is what the individual, considering his various strengths and weaknesses, can earn in the marketplace. Simply because an employee has reached maximum medical improvement does not mean that his or her loss of earning capacity cannot thereafter be reduced through vocational rehabilitation.

We hold, at least in injuries involving disability of the body as a whole, that when a compensation court awards voca-

tional rehabilitation, it should postpone a determination of loss of earning capacity until after the completion of that rehabilitation. As a result, the judgment of the review panel, remanding for immediate determination of loss of earning capacity, is also reversed.

## CONCLUSION

The judgment of the Workers' Compensation Court remanding the cause to the trial judge for a redetermination of vocational rehabilitation and loss of earning capacity is hereby reversed. In all other respects, the judgment is affirmed. Gibson is awarded $2,500 for his attorney's services in this court.

AFFIRMED IN PART, AND IN PART REVERSED.